## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
UNITED STATES OF AMERICA          . CRIMINAL NO. 16-10179-IT
                                  .
          V.                      . BOSTON, MASSACHUSETTS
                                  . MAY 26, 2016
ALEX HERNANDEZ                    .
     Defendant                    .
. . . . . . . . . . . . . . . . .
```

### TRANSCRIPT OF PROBABLE CAUSE HEARING
### BEFORE THE HONORABLE JENNIFER C. BOAL
### UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

UNITED STATES ATTORNEY'S OFFICE
Jordi deLlano, Esq.
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3155
jordi.de.llano.campos@usdoj.gov

FEDERAL PUBLIC DEFENDER
Miriam Conrad, Esq.
51 Sleeper Street, 5th Floor
Boston, MA 02210
617-223-8061
miriam_conrad@fd.org

Court Reporter:

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**

2

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| Brian Sindoni | 6 | 9 | 33 | 38 |

1  (Case called into session)

2  (9:21:10 PM)

3          THE CLERK:  Today is May 26, 2016.  We're on the

4  record in the matter of United States v. Alex Hernandez,

5  Case No. is 16-MJ-7157.

6          Will counsel please identify themselves for the

7  record?

8          MR.DELLANO:  Good morning, Your Honor, Jordi

9  deLlano on behalf of the United States.

10          THE COURT:  Good morning.

11          MS. CONRAD:  Good morning, Your Honor, Miriam

12  Conrad for Mr. Hernandez and if the Court would allow

13  Olivia Warren, a law student working in our office this

14  summer to remain at counsel table?

15          THE COURT:  Yes, of course.

16          MS. CONRAD:  Thank you.

17          THE COURT:  So I just first wanted to address

18  the detention issue.  If I remember correctly from the

19  last hearing the defendant was not willing to waive his

20  rights under the IAD but wanted me to enter a *United*

21  *States v. King* order.  I think the *United States v. King*

22  order would require me to send him back to state custody.

23          MS. CONRAD:  Oh, then--

24          THE COURT:  So I think I should just enter a

25  voluntary order of detention without prejudice.

4

1          MS. CONRAD:  Well, I don't think in a

2    voluntary order of detention, Your Honor.

3          THE COURT:  Okay.

4          MS. CONRAD:  All I'm asking is the Court defer

5    the detention proceedings until such time as the state

6    sentence has expired--

7          THE COURT:  But--

8          MS. CONRAD:  --because under the IAD his time on

9    the state sentence continues to run while he's in federal

10   custody.  So it's not really, he's not really detained

11   currently.  He is continuing to serve a state sentence.

12   He has just by virtue of not waiving the anti-shuttling

13   provision, the IAD requires that he remain in federal

14   custody until the, these proceedings have concluded, but

15   there's really no purpose at this point to rule on the

16   detention motion because he's not going anywhere.  He's

17   serving a sentence.

18         THE COURT:  So Ms. Conrad, you've given me food

19   for thought.  I will go back and look at everything again.

20   If, I'll enter an order perhaps and obviously you're free

21   to ask me to reconsider if you think I get it wrong.  Mr.

22   deLlano, do you wish to contribute to this debate?

23         MR. DELLANO:  The only thing I can contribute--

24         THE COURT:  Yes.

25         MR. DELLANO:  --is to say that I agree with Ms.

5

1   Conrad as far as the, the lack of waiving the anti-

2   shuttling--

3           THE COURT:  Yeah.

4           MR. DELLANO:  --provisions of the IAD would mean

5   that he does remain in, in federal custody.  I don't know

6   what the appropriate order if any the Court should order--

7           THE COURT:  Okay.

8           MR. DELLANO:  --should enter at the moment.  I'm

9   happy to also look into it--

10           THE COURT:  Yeah, and I think--

11           MR. DELLANO:  --and I would need to--

12           THE COURT:  --I don't do this as a practice.  I

13   know Judge Collings does.  He enters a temporary order

14   between the time of arrest and the time of a detention

15   hearing.  I don't know, maybe that's appropriate.  I can

16   look at that as well.

17           MS. CONRAD:  Order of exclusion or--

18           THE COURT:  No, no, no, just about holding the

19   person here in--

20           MS. CONRAD:  I, I think he's just held by virtue

21   of the provisions of the IAD at this point, so the only

22   order I was--

23           THE COURT:  But he's waiving his right to a

24   prompt federal detention hearing if I understand it.

25           MS. CONRAD:  Well because at this point it would

6

1    be pointless.  So--

2            THE COURT:  Okay.

3            MS. CONRAD:  --I'm just giving the Court, if the

4    Court, I would propose--

5            THE COURT:  Okay.

6            MS. CONRAD:  --that the order simply defer

7    ruling with the consent of the defendant, defer ruling on

8    the motion for detention until such time as his state

9    sentence has been satisfied.

10           THE COURT:  All right, thank you.  All right, so

11   we're here for a probable cause hearing.  Mr. deLlano, do

12   you have any exhibits?

13           MR. DELLANO:  I have just well it's only the

14   affidavit, Your Honor.

15           THE COURT:  Okay, all right, and whether or not

16   I need to admit it.

17           MR. DELLANO:  Right.

18           THE COURT:  I'm not sure I do cause it's already

19   part of the record.  So, and do you have a witness?

20           Mr. DELLANO:  I do, Special Agent Brian Sindoni.

21             SPECIAL AGENT BRIAN SINDONI, SWORN

22           THE CLERK:  Would you please state your full

23   name for the record and spell your last name?

24           THE WITNESS:  Brian Sindoni, S-I-N-D-O-N-I.

25           THE CLERK:  You may be seated.

1      THE WITNESS:  Thank you.

2                    DIRECT EXAMINATION

3  BY MR. DELLANO:

4  Q     Good morning, sir.

5  A     Good morning.

6  Q     Would you please tell us whether you're, or how

7  you're currently employed?

8  A     I am a senior special agent with the United States

9  Secret Service.

10 Q     And how long have you served in that capacity?

11 A     Since September 15, 1995.

12 Q     Are you currently assigned to a particular unit or

13 group within the Secret Service?

14 A     I am currently assigned as a task force officer with

15 the Federal Bureau of Investigation, Joint Terrorism Task

16 Force, Counter-terrorism Squad Number two.

17 Q     And what are generally, what are your duties and

18 responsibilities as a special agent on that task force?

19 A     To investigate threats to harm or kill the President

20 of the United States, the Vice President of the United

21 States, presidential candidates and former presidents.

22 Q     Sir, did you participate in an investigation that led

23 to the arrest of the defendant Mr. Hernandez?

24 A     I did.

25 Q     And would you just briefly tell the, explain what the

8

1  nature of that investigation was.

2  A    I received information that Mr. Hernandez had

3  threatened to harm and kill the President of the United

4  States.

5  Q    Okay sir, as part of your investigation did you have

6  occasion to prepare an affidavit?

7  A    I did, sir.

8        MR. DELLANO:  Your Honor, may I show?

9        THE COURT:  Yes.

10  BY MR. DELLANO:

11  Q    Sir, I'm handing you what's marked Exhibit 1, marked

12  for identification as Exhibit 1.

13  A    Um-hmmm.

14  Q    Do you recognize that document?  Look at it all.

15  A    Yes, sir.  I do.

16  Q    What do you recognize it to be?

17  A    My affidavit.

18  Q    The affidavit you prepared in connection with this

19  matter?

20  A    Yes, sir.  Yes it is, sir.

21  Q    Okay.  Is that your signature on the last page, sir?

22  A    Yes sir, it is.

23  Q    Does that affidavit set forth the facts of your

24  investigation as you knew them up until the arrest of Mr.

25  Hernandez?

1  A    Yes, it does.

2  Q    So the information that was sworn to you or signed by

3  you is contained in that affidavit sworn by you, to the

4  best of your knowledge is that information still acc,

5  accurate and correct?

6  A    Yes, it is, sir.

7           MR. DELLANO:  Your Honor, I'd offer it into

8  evidence if need be but leave it as Exhibit 1.

9           THE COURT:  All right, to the extent necessary.

10  Ms. Conrad?

11           MS. CONRAD:  No objection except as to paragraph

12  26 which Agent Sidoni expresses his belief that there's

13  probable cause as to belief the defendant committed the

14  crime charged which is for this Court to determine not for

15  the agent.

16           THE COURT:  Well, I agree.  I won't accept that.

17  Just because it's going into evidence that the hearings

18  over on that basis alone.  All right.

19           MR. DELLANO:  Your Honor, I'm going to rely on

20  that.

21           THE COURT:  All right.

22           MR. DELLANO:  --and offer Ms. Conrad at this

23  time for cross examination.

24           THE COURT:  All right.

25           MS. CONRAD:  Sure, thank you.

10

1          MR. DELLANO:  Thank you.

2                    CROSS EXAMINATION

3   BY MS. CONRAD:

4   Q    Good morning, Agent Sidoni.

5   A    Good morning.

6   Q    So let me back you up to the beginning of this

7   investigation.  I understand it started with information

8   received from a cooperating witness or an informant,

9   correct?

10  A    Yes, ma'am.

11  Q    And that was an inmate at Old Colony, an inmate with

12  Mr. Hernandez.  I'm sorry, that's not--

13  A    Norfolk, ma'am.

14  Q    Norfolk.  MCI-Norfolk.  Thank you for the correction.

15  Now was that individual someone who had previously

16  provided information to law enforcement?

17  A    I was advised by the FBI he had.

18  Q    And so do you know if he had a record with, he had an

19  informant file with the FBI?

20  A    I believe he does, yes.

21  Q    And he was serving a sentence at that time?

22  A    Yes.

23  Q    Do you know what he was serving a sentence for?

24  A    I do not.

25  Q    You don't know what he was serving a sentence for?

1  A     No, ma'am.

2  Q     Do you know what the length of that sentence was?

3  A     I do not.

4  Q     Do you know what the nature of his past cooperation

5  with the FBI had been?

6  A     I do not.

7  Q     Was this an instance where he reached out to the FBI

8  or the FBI reached out to him?

9  A     He reached out to the Department of Corrections and

10  the FBI.

11  Q     And I'm sorry, did I ask if you know whether he has a

12  past criminal record?

13  A     You did ask.  I said I don't, I'm sorry.  Can you

14  repeat the question?

15  Q     Do you know whether the informant had a past criminal

16  record other than the one for which he was serving a

17  sentence?

18  A     I do not.

19  Q     But fair to say it would be a state prison sentence

20  that he was serving?

21  A     Yes.

22  Q     I need a verbal answer.

23  A     Yes.

24  Q     Thank you.  And do you know if he has a history of

25  drug use?

1  A    I do not know.

2  Q    Now he had a number or reported anyway, a number of

3  conversations with Mr. Hernandez, correct?

4  A    Correct.

5  Q    And none of those were recorded.  Is that correct?

6  A    Correct.

7  Q    None of them?

8  A    To the best of my knowledge between the CW and Mr.

9  Hernandez?

10  Q    Correct.

11  A    To my knowledge, no, none were recorded.

12  Q    So was that an investigative decision that was made

13  after this investigation began not to record those

14  conversations with the informant?

15  A    I don't believe there was a decision made one way or

16  the other.

17  Q    Well, certainly you had the ability to tape the court

18  conversations, correct?

19  A    Well there was a discussion.  We were concerned, we

20  actually discussed possibly using, wiring the CW but we

21  felt it was too dangerous in that location.

22  Q    So at some point - and did you have any direct

23  contact with the informant?

24  A    I do not.

25  Q    Ever?

13

1   A     No, ma'am.

2   Q     You've never interviewed him?

3   A     No.

4   Q     Never reviewed his informant file?

5   A     No, ma'am.

6   Q     Don't know whether he has in the past provided

7   reliable information or not?

8   A     I do not know.

9   Q     Do not know whether he has in the past been

10  disciplined for violating terms of his informant

11  agreement?

12  A     I do not know.

13  Q     Do you know do you even know if he has an informant

14  agreement?

15  A     I do not know.

16  Q     Do you know what if any benefits were conveyed to him

17  as a result of his participation in this investigation?

18  A     I know there was a discussion by the FBI to pay the

19  CW.

20  Q     How much?

21  A     I believe it was $850.

22  Q     And what about assistance with his current prison

23  sentence?

24  A     I do now know.

25  Q     You don't know?

14

1    A    No, ma'am.

2    Q    Are you the case agent on this?

3    A    Yes, ma'am, I am.

4    Q    Okay, and at some point, letters, the CW obtained

5    letters from Mr. Hernandez, correct?

6    A    He received one letter from Mr. Hernandez.

7    Q    But two letters were sent?

8    A    Correct.

9    Q    So was it the first or the second letter that was

10   received by the informant?

11   A    The second letter.

12   Q    And are you aware of to whom Mr. Hernandez thought he

13   was writing when he wrote those letters?

14   A    Yes, I do.

15   Q    And who was he writing to?

16   A    He believed he was writing to a contact with the CW.

17   Q    Right, a contact where?

18   A    On the outside, outside of jail.

19   Q    Well, I think in your complaint affidavit, I'll have

20   to, I think paragraph 7?

21   A    Um-hmmm.

22   Q    If I could turn your attention to paragraph 7?  It

23   says in or around August 2015, the CW told Hernandez that

24   he had a contact who worked in an embassy--

25   A    Correct.

15

1  Q    --and could assist him with obtaining false travel

2  documents.

3  A    Correct.

4  Q    And again, you weren't present for that conversation

5  and it was not recorded?

6  A    No, ma'am.

7  Q    So your information that you've set forth in

8  paragraph 7 is based purely on what the informant told the

9  FBI and what the FBI told you?

10 A    Correct.

11 Q    So two steps removed, right?

12 A    Yes.

13 Q    And have you reviewed reports that recount that?

14 A    Reviewed reports.  I believe there is a report.

15 Q    Okay, and is that something that you reviewed in

16 anticipation of your testimony here today?

17 A    No.

18 Q    And in which embassy did he say his contact worked,

19 if you know?

20 A    I do not know.

21 Q    Well, how was the letter addressed?

22 A    The address is provided to the CW with a post office

23 box and a name was provided.  I don't know if the CW told

24 Mr. Hernandez a specific embassy.

25 Q    And the letters were written in Spanish, right?

1   A    Correct.

2   Q    And not very good Spanish at that?

3   A    I wouldn't know.  I don't speak Spanish.

4   Q    Well, do you know how to spell the word gracias?  G-

5   R-A-C-I-A-S?

6            MR. DELLANO:  Objection, Your Honor.  He doesn't

7   speak Spanish he testified.

8            THE COURT:  If you know.  If you don't know.

9   A    I, I don't know.

10  BY MS. CONRAD:

11  Q    Did anybody, did anybody tell you whether the letter

12  was written in good or bad Spanish?

13  A    Not that I recall.

14  Q    Okay.  Was any handwriting analysis conducted?

15  A    No, ma'am.

16  Q    And the letter, so I'm just trying to understand why,

17  I mean presumably the CW had to, the informant had to give

18  Mr. Hernandez a reason why he was writing such a letter,

19  right?

20  A    Um-hmmm.  Yes, ma'am.

21  Q    And why he was writing to someone in an embassy.

22  A    My understanding is that Mr. Hernandez requested

23  assistance from the outside in obtaining fraudulent

24  documents and the CW advised him that he knew someone that

25  could help him with that and that's why the letter was

17

1  written.

2  Q    And do you know whether it was discussed whether the

3  letter should be in English or Spanish?

4  A    I do not know.

5  Q    Do you know what country he was told this embassy was

6  affiliated with?

7  A    I do not know.

8  Q    You don't know that?

9  A    No, ma'am.

10 Q    Was the informant told what to tell Mr. Hernandez

11 regarding these letters?

12 A    The portion about the embassy was actually basically

13 freelanced by the CW.  We didn't tell him to say embassy.

14 He was not advised to use the word embassy.

15 Q    And how much of what the informant did in this case

16 was as you put it, freelance?

17 A    To my knowledge, that's the only portion.

18 Q    But you were not able to monitor what he did or

19 didn't tell Mr. Hernandez?

20 A    That's correct.

21 Q    And did the informant at any time request assistance

22 from the government with respect to his state sentence as

23 a result of his participation in this?

24 A    I don't know.

25 Q    You were not his handler fair to say?

18

1   A    Correct, I'm not his handler.

2   Q    So that conversation probably would have been

3   conducted by the handler?

4   A    If one had occurred, yes, I would assume.

5   Q    Now are you aware what, if any, mental health history

6   the informant has?

7   A    I am.

8   Q    And?

9   A    Mr. Hernandez told me on Monday that he was diagnosed

10  with a mental illness.

11  Q    With a men, mental illness?

12  A    Yes, ma'am, mental illness.

13  Q    The informant told you that?

14  A    No, Mr. Hernandez did.

15  Q    Okay, I'm asking two different questions.  You jumped

16  at--

17  A    Oh, I'm sorry.  I apologize.

18  Q    --you anticipated my next question--

19  A    I apologize.

20  Q    --so maybe we should, we should stick with that.  Are

21  you aware of whether Mr. Hernandez has ever been diagnosed

22  with or treated for a mental illness?

23  A    Mr. Hernandez told me that he's been diagnosed with a

24  mental illness.

25  Q    Well you were in touch with department, State

1   Department of Corrections?

2   A     Correct.

3   Q     And did you inquire or, or did you learn from the

4   State Department of Corrections that Mr. Hernandez has

5   been treated for a diagnosed mental illness while in DOC

6   custody?

7   A     I was not.

8   Q     Isn't that something that secret service is usually

9   interested in and is the mental health history of persons

10  that they're investigating?

11  A     Absolutely.

12  Q     But you've made no inquiry regarding that?

13  A     No.

14  Q     Is there a reason why?

15  A     We'd have to obtain those records.  We'd need a

16  subpoena and then we--

17  Q     Well wasn't DOC working with you as a task force

18  officer?

19  A     They were.

20  Q     So DOC would have access to that information,

21  correct?

22  A     I would, I don't know what the procedure is.

23  Q     Well you never just asked them whether they had

24  access to those records and whether they were aware of

25  any, sorry, let me know ask a compound question.

1      Did you ever ask DOC, the task force officer

2  whether they were aware of any diagnosed mental illness

3  that Mr. Hernandez was being treated for in DOC?

4  A    Not that I recall.

5  Q    And they never volunteered that information?

6  A    No, ma'am.

7  Q    And it just didn't occur to you to inquire?

8  A    No, ma'am.

9  Q    And who wrote in, the letters themselves do not make

10  any reference to a plot to kill the president or threats--

11  A    They do not.

12  Q    --or threats to the president?

13  A    They do not.

14  Q    And in fact you wrote in your affidavit that, and I'm

15  looking now on page, at a report you authored dated,

16  excuse me, it's an email from you dated December 5, 2015

17  in which you say that Hernandez has authored a second

18  letter regarding becoming a martyr, correct?

19  A    Correct.

20  Q    But the first letter, the word martyr or even the

21  Arabic word Shahid for martyr does not appear in that

22  letter, correct?

23  A    Correct, well, I don't, I don't, I don't recall.

24  Q    Would you like to look at it?

25  A    I'd have to look at it please.

21

1  Q    Sure.

2  A    I don't recall.

3        MS. CONRAD:  Okay, and Mr. deLlano, I'm looking

4  at the translation at page 24.  AM Here's the translation.

5  I can show you the Spanish one.  It's 23 as well.

6  BY MS. CONRAD:

7  Q    Okay, so, having had a chance to review that do you

8  see any reference to be martyr or Shahid?

9  A    No, I do not.

10 Q    Now you also make reference in your complaint

11 affidavit to some documents that were seized by DOC

12 personnel in, from Mr. Hernandez' cell, correct?

13 A    Correct.

14 Q    And that was as a result of a search I think that

15 took place on February 10th of this year and there may have

16 been a prior one as well.  Yeah, there was one on December

17 10, 2015, correct?

18 A    Correct.

19 Q    Now in it you reference what appear, this is

20 paragraph 13, what appear to be photocopies of portions of

21 a U.S. Social Studies textbook listing former U.S.

22 presidents and containing the handwritten notation kill

23 underneath those that have been assassinated while in

24 office?

25 A    Correct.

22

1   Q    And no handwriting analysis has been conducted of

2   that either?

3   A    It has not.

4   Q    And in addition, there were other notations under the

5   names of some of the other presidents, were there not?

6   A    Yes, there were.

7   Q    Including slavery?

8   A    That's correct.

9   Q    And other notations regarding the historical

10  significance of these particular presidents?

11  A    I don't recall the other ones.

12  Q    Well there were other things that were, if I could

13  just borrow that binder from Mr. deLlano.  There were

14  other portions that were underlined also, right?

15  A    I believe so.

16            MS. CONRAD:  May I approach the witness, it

17  might be--

18            THE COURT:  Yes.

19  BY MS. CONRAD:

20  Q    For example, he underlined, or excuse me, if we don't

21  know who did it, so under Adams, John Adams, he was the

22  first president to live in the Uni, in the White House,

23  correct?

24  A    That's correct.

25  Q    Under Jefferson, the Louisiana Purchase, referenced

23

1  the Louisiana Purchase is referen, is underlined,

2  correct?

3  A    That's correct.

4  Q    James Monroe underlined, has underlined he bought

5  Florida from Spain, correct?

6  A    That's correct.

7  Q    John Quincy Adams it has underlined that he spoke,

8  spoke out against slavery and the year of his death?

9  A    Correct.

10 Q    And there's sort of a notation next to John Adams,

11 right?

12 A    Yes, there is.

13 Q    I take you didn't construe that as a threat to kill

14 John Adams?

15 A    No, ma'am.

16 Q    And the notation slavery is written under James

17 Buchanan's entry, right?

18 A    Yes, it is.

19 Q    And there's a mark, I think that's it for the

20 underlining.  There's also--

21        MS. CONRAD: If I could just remain here for a

22 moment because I'd like to show the agent some documents.

23 It would be easier than going back and forth and relying

24 on them.

25 BY MS. CONRAD:

24

1   Q    So going through these documents, there's, on this

2   page a what appears to be a photocopy of an article that

3   says "Get connected to God", right?

4   A    That's correct.

5   Q    And it seems to come from a publication from a group

6   called "Yard Out", correct?

7   A    Yes, it does.

8   Q    And it says "Care of Prisoners for Christ"?

9   A    Yes, it does.

10  Q    And there's nothing that you saw in this that

11  indicates an intention to harm the President of the United

12  States, correct?

13  A    No, it does not.

14  Q    And there's a, what appear to be news photographs,

15  correct?

16  A    Yes, they do.

17  Q    And there's no written notation on those news

18  photographs?

19  A    No, there's not.

20  Q    And there is a discussion of jihad in the Islamic

21  state in Spanish?

22         MR. DELLANO:  Your Honor, I'd ask Ms., Ms.

23  Conrad to show--

24         MS. CONRAD:  Oh, sorry.

25         MR. DELLANO:  --to report those are not bates so

1   okay so the news photographs were those photos?

2          MS. CONRAD:  Yeah, I can--

3          MR. DELLANO:  Okay.  Okay.  Thank you, sorry.

4          THE COURT:  Do you want to use the projector or

5   your--

6          MS. CONRAD:  Oh, I didn't--

7          MR. DELLANO:  I'm fine.  I just wanted to know.

8          THE COURT:  Okay.  All right.

9          MS. CONRAD:  Well actually, maybe it would be

10  better for the Court.

11         THE COURT:  Okay.

12         MS. CONRAD:  You know, I'm, I'm almost done with

13  this, Judge.

14         THE COURT:  Okay.  All right.

15         MS. CONRAD:  --take the time, but I appreciate

16  the offer and I'll keep it in mind for the future.

17  BY MS. CONRAD:

18  Q    And there are some more news articles and

19  photographs, correct?

20  A    Yes, there appear to be, yes.

21  Q    And then there's a handwritten document that is a

22  quotation from Dr. Martin Luther King, Jr., correct?

23  A    I don't know if it is from Dr. Martin Luther King,

24  Jr., but his name is underneath it.

25  Q    Well what it says is, "The ultimate measure of a man

26

1   is not where he stands in moments of comfort and

2   convenience but where he stands at times of challenge",

3   and then it says "A" instead of and, presumably and,

4   controversy Dr. Martin Luther King, Jr., right?

5   A    That's correct.

6   Q    And you have no reason to think that's not by Martin

7   Luther King, Jr.?

8   A    I, I have no reason to believe it's not.

9   Q    And fair to say that that handwriting appears

10  different from the handwriting on the left?

11  A    I didn't do a comparison on the handwriting.

12  Q    Well if you, hold on.  Bates stamp 25, if you look at

13  that handwriting, it doesn't really look very similar,

14  does it?

15  A    May I?

16  Q    Oh, sure.  Well I'm not asking you to do a, an

17  analysis and I'm sure you're, I assume you're not--

18  A    I'm not, I'm not here on--

19  Q    --but just would it be fair to say that they do not

20  look similar?

21  A    It's fair to say that they do not appear to be

22  similar.

23  Q    But at any rate, this quotation from Dr. Martin

24  Luther King, Jr., or this quotation whoever it's from,

25  does not contain any indication of an intention to harm

27

1  the President of the United States, does it?

2  A    It does not.

3  Q    And would you agree with me that Dr. Martin Luther

4  King, Jr., was a renowned pacifist?

5  A    Absolutely.

6  Q    And there's also a quote from Muhammed or purports to

7  be from Muhammed Ali, correct?

8  A    Correct.

9  Q    And the quote is, "There's nothing wrong with getting

10  knocked down as long as you get right back up."

11  A    Correct.

12  Q    Nothing dealing with jihad or intention to harm the

13  President of the United States in that7?

14  A    No.

15  Q    And then there's an unattributed portion that says,

16  "Never let your head hang down.  Never give, give up and

17  sit and grieve.  Find another way and don't pray when it

18  rains if you don't pray when the sun shines."  There's a

19  little cut off there, but--

20  A    Um hmmm.  Yes, it does.

21  Q    --are you sure that's what it says?

22  A    Yes.

23  Q    Okay, again, nothing referencing jihad--

24  A    No, ma'am.

25  Q    --or an intention to harm the president of the United

1  States?

2  A     No.

3  Q     Sort of more general spiritual uplift kind of

4  language?

5  A     Yes.

6  Q     And then there are some more things about jihad.

7  There's a book called the *Middle East* it looks like?

8  A     Yes.

9  Q     There is a photo of Osama bin Laden.  A couple of

10  photos of Osama bin Laden.  There's also a photograph of a

11  motorcycle, right?

12  A     Yeah, there are two photographs of motorcycles, but

13  yes.

14  Q     And there's also looks like photos of lottery

15  tickets?

16  A     I believe those are lottery tickets.

17  Q     And then there is some Arabic writing and it just

18  refers to Allah generally, right?

19  A     It appears to be Arabic.  I don't know if it's Farsi

20  or Arabic, but it's sa--

21  Q     The, the English portion does not reference jihad,

22  correct?

23  A     May I read it?

24  Q     Sure.

25  A     It is not.

1  Q    And then it looks like there's someone practicing

2  Arabic writing?

3  A    Correct.

4  Q    And then it looks like there is just a sort of, well

5  it's in Spanish so we can't really tell, but I assume

6  you've had someone translate this?

7  A    I have not.

8  Q    Okay, so, but it appears to just be a book or almost

9  a textbook about Islam?

10 A    That's what it appears to me, yes.

11 Q    Thank you.  So fair to say that the only recorded

12 statements in which it is alleged that Mr. Hernandez

13 expressed an interest in harming the President were those

14 made in a recorded statement to the undercover, correct?

15 A    On two occasions, correct.

16 Q    And those have not yet been provided to me to your

17 knowledge, correct?

18 A    I don't know if they've been provided to you.

19        MS. CONRAD:  Can we stipulate they haven't been

20 provided?

21        MR. DELLANO:  Stipulate they have not been

22 provided.

23        THE COURT:  Okay.

24 BY MS. CONRAD:

25 Q    Okay, and I'm sorry, did I, I asked you whether you

1  spoke Spanish, correct?

2  A    You asked.  I do not, ma'am.

3  Q    And I take it the informant speaks Spanish?

4  A    I, I don't know.

5  Q    Does the undercover speak Spanish?

6  A    Yes, he does.

7  Q    And you don't know, just I'm asking, I know I've

8  asked this a couple different ways but maybe I'm just,

9  want to make sure because well, I'll, I'll reserve on any

10  editorial comment, but you don't know what country,

11  embassy the undercover was posing as being associated

12  with?

13  A    No, ma'am, I do not.

14  Q    And is it correct that apart from seeking false

15  travel documents, Mr. Hernandez did not ask the undercover

16  for any assistance in attempting to harm the President of

17  the United States?

18  A    He did not.

19  Q    So he didn't ask to be provided with any weapons,

20  correct?

21  A    He did not.

22  Q    And this type of letter, are you familiar with the

23  term tradecraft?

24  A    I am.

25  Q    And tradecraft generally refers to techniques used by

31

1    in this, well, as I'm familiar with it, terrorists,

2    alleged terrorists, correct?

3    A    In this situation?

4    Q    Well I'm just asking tradecraft generally, what's

5    your understanding of the term?  Let me ask you then I'll

6    make a--

7    A    Tradecraft meaning any, any skill traded to a

8    profession or a skill set.

9    Q    And there's no tradecraft in this case is there?

10   A    I believe there is.

11   Q    What is it?

12   A    Mr. Hernandez said he wants to shoot like a sniper.

13   Q    Well but writing a letter--

14   A    Um-hmmm.

15   Q    --with one's own name and identifying information

16   certainly doesn't fall within the banner or the umbrella

17   of the type of tradecraft in which individuals attempt to

18   conceal their identity and avoid detention, correct?

19   A    I don't know the answer to that.

20   Q    Why not?  Well, let me ask it a different way.  In

21   the letter, Mr. Hernandez, or the letters excuse me, Mr.

22   Hernandez made no effort to conceal his identity or

23   location, correct?

24   A    In his letters he did not.

25   Q    And--

32

1          MS. CONRAD:  May I just have one--

2          THE COURT:  Yes.

3          MS. CONRAD:  --moment please?

4          THE COURT:  Yes.

5   BY MS. CONRAD:

6   Q    Who do you know at least according to the informant

7   since we don't have a recording, do you know who raised

8   the issue of obtaining a false passport?

9   A    I believe Mr. Hernandez did.

10  Q    Okay, but that's the informant's story, right?

11  A    That's what I was told, yes.

12  Q    And it's certainly possible that the informant raised

13  it, correct?

14  A    It's possible.

15  Q    And do you know who's idea it was to write to this

16  contact?

17  A    It was, basically it was a group effort between the

18  FBI and the Department of Corrections.

19  Q    No, I'm sorry, as between--

20  A    Oh.

21  Q    --did Mr. to your knowledge, did the informant

22  suggest to Mr. Hernandez that he write this letter?

23  A    Oh, I apologize.  My understanding is that the, the

24  CW told Mr. Hernandez that if he wishes help on the

25  outside to go ahead and write a letter to this person.

1   Q    And do you know whether the informant told Mr.

2   Hernandez what to say in that letter?

3   A    I believe I was told that he said if you want help

4   from the outside ask him to come see you.

5   Q    But not to give any, do you know whether he made any

6   suggestions regarding the content of the letter?

7   A    I don't know that.

8   Q    Do you know in fact whether it was the informant who

9   wrote the letter--

10  A    I do not know.

11  Q    --as opposed to Mr. Hernandez?

12  A    Don't know.

13  Q    In fact that could be the informant's handwriting and

14  not Mr. Hernandez' handwriting?

15  A    It could.

16          MS. CONRAD:  May I just have one moment?

17          THE COURT:  Yes.

18  PAUSE

19          MS. CONRAD:  That's all I have, Your Honor.

20  Thank you.

21          THE COURT:  All right.

22          MS. CONRAD:  Thank you very much.

23          THE WITNESS:  Thank you.

24          THE COURT:  Mr. deLlano, anything?

25                  REDIRECT EXAMINATION

1     MR. DELLANO: Yes.

2 BY MR. DELLANO:

3 Q Starting with that final point, you, I believe you

4 said you did not whether the letter given, letter given by

5 Mr. Hernandez to the cooperating witness was drafted by

6 Hernandez for the cooperating witness, correct?

7 A Correct.

8 Q The first letter though, how did that reach law

9 enforcement?

10 A It was it was, went through the U.S. mail and arrived

11 at the FBI undercover mailbox.

12 Q And do you know who sent that letter?

13 A I believe it's, I do not know for certain.

14 Q But the letter, is there a postmark on that letter?

15 A Yes, there was.

16 Q Do you know with the Department of Corrections when

17 an individual sends a letter out, when an inmate sends a

18 letter, do you know whether the department of corrections

19 makes a notation or a record?

20 A I believe they do.

21 Q Okay, so an individual sends the letter, Do you know

22 there's a record in this case of whether that first letter

23 in November 23 or November, November 2015 letter, whether

24 there was a record that inmate Hernandez sent that?

25 A Yes.

1  Q    Do you know?

2  A    Yes.

3  Q    Is there a record?

4  A    I believe there is.

5  Q    So that would not have - let me, let me ask you, Ms.

6  Conrad asked you about whether during the conversation,

7  you reviewed both the, the substance of both the meetings

8  that occurred with the undercover?

9  A    I have.

10  Q    The December 22, 2015 and the February 12, 2016

11  meeting?

12  A    Correct.

13  Q    Ms. Conrad I believe asked you whether Mr. Hernandez

14  had asked for assistance other than obtaining travel

15  documents from the undercover.

16  A    Correct.

17  Q    Do you recall that question?

18  A    I do recall that.

19  Q    In fact he did not - Ms. Conrad also asked or, asked

20  you whether he asked for assistance from the use, or from

21  the undercover in obtaining weapons--

22  A    She did ask that question.

23  Q    --and your answer was--

24  A    No, he did not.

25  Q    Were there discussions during those meetings as to

36

1   where Mr. Hernandez was going to obtain his weapon?

2   A    There--

3          MS. CONRAD:  Objection, scope.

4          MR. DELLANO:  Directly to the point of--

5          MS. CONRAD:  No, I asked about--

6          MR. DELLANO:  --why he would not need a gun.

7          THE COURT:  I'll allow it.

8   A    There was.

9   BY MR. DELLANO:

10  Q    And could you summarize why he did not need the

11  undercover's assistance in that?

12         MS. CONRAD:  Well, objection to characterizing

13  as didn't need.  That was not--

14         MR. DELLANO:  Okay well--

15         MS. CONRAD:  --that's not been the testimony.

16         MR. DELLANO:  --or, or rather--

17         THE COURT:  All right.

18         MR. DELLANO:  I'll rephrase, I'll rephrase.  I

19  apologize.

20  BY MR. DELLANO:

21  Q    Can you explain was there a discussion as to whether

22  he had access to weapons?

23  A    There was.

24  Q    And what did the, what is your recollection was

25  discussed?

37

1   A    My recollection is Mr. Hernandez said he had access

2   to weapons?

3   Q    How?

4   A    On the outside, that he had a connection.

5   Q    And is that connection, do you recall where that

6   connection was located?

7   A    I do.

8   Q    Where?

9   A    In the state of Florida.

10  Q    So they discussed where that connection was located--

11  A    It was.

12  Q    --and he can ge -.  Okay.  Touching back to this the

13  cooperating witness, you are the case agent on this case

14  are you not?

15  A    I am.

16  Q    But the, the cooperating witness or CW, that is an

17  FBI source, correct?

18  A    It is an FBI source.

19  Q    Okay so, so you did not have interaction with that

20  CW?

21  A    I had no interaction.

22  Q    Okay.  We discussed this morning about conversations

23  with the CW and, between CW and Mr. Hernandez and letters

24  that were sent between or right, letters that were a

25  letter that was provided by Mr. Hernandez to the CW.

38

1  There were two meetings with an undercover, correct?

2  A    That is correct.

3  Q    What were those dates again?

4  A    December 22, 2015 and February 12th, approximately

5  February 12, 2016.

6  Q    So those meetings were recorded?

7  A    They were.

8  Q    Was the CW present in any of those meetings?

9  A    He was not.

10  Q    Sir, we talked about some of the items that were

11  recovered from Mr. Hernandez' cell.  Ms. Conrad asked you

12  about news articles or pictures that looked like they were

13  from news articles--

14  A    That's correct.

15  Q    --correct?

16        MS. CONRAD:  I think what I said was news

17  photos.

18        MR. DELLANO:  News photos, sorry.

19  BY MR. DELLANO:

20  Q    Is that correct?

21  A    Yes.

22  Q    Are those the photos that are referred to in

23  paragraph, paragraphs 20 and 21 of your affidavit?

24  A    Yes, they are.

25  Q    Okay.

1            MR. DELLANO:  One moment, Your Honor.

2    PAUSE

3            MR. DELLANO:  I have nothing further, Your

4    Honor.

5            THE COURT:  All right.  Ms. Conrad, anything

6    further on that?

7            MS. CONRAD:  Very briefly.

8            THE COURT:  Yup.

9                    RECROSS EXAMINATION

10   BY MS. CONRAD:

11   Q    So, Mr. deLlano asked you some questions about the

12   mailing of the first letter?

13   A    Correct.

14   Q    And you still don't know who wrote that letter,

15   correct?

16   A    I do not.

17   Q    Thank you.

18   A    Okay.

19           THE COURT:  All right, you may step down.  Thank

20   you very much.

21           THE WITNESS:  Thank you.

22       WITNESS, excused.

23           THE COURT:  Any further witnesses or evidence

24   Mr. deLlano?

25           MR. DELLANO:  No further witnesses or evidence,

40

1    Your Honor.

2            THE COURT:  Any evidence, other evidence, Ms.

3    Conrad?

4            MS. CONRAD:  No, Your Honor.

5            THE COURT:  All right, so I'll hear argument.

6            MS. CONRAD:  I'll waive argument.

7    (End of audio)

8    (10:53:57 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

41

CERTIFICATION

1

2      I, Maryann V. Young, court approved transcriber,

3  certify that the foregoing is a correct transcript from

4  the official digital sound recording of the proceedings in

5  the above-entitled matter.

6

7  /s/ Maryann V. Young              June 24, 2016

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25